The appealing party has shown good grounds to reconsider the evidence. However, upon reconsideration of the evidence, the Full Commission finds the same facts and reaches the same conclusions as those reached by the Deputy Commissioner. The Full Commission, in its discretion, has determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support the findings of fact, conclusions of law, and ultimate award.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the occupational disease giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the occupational disease giving rise to this claim, the employee-employer relationship existed between plaintiff and defendant-employer.
3. At the time of the occupational disease giving rise to this claim, defendant-employer was self-insured pursuant to the terms of G.S. 97-93. Key Risk Management Services, Inc. was the carrier on the risk for defendant-employer until 31 December 1995. Thereafter, Riscorp became the carrier on the risk.
4. Plaintiff's average weekly wage was $509.04.
5. Plaintiff sustained an occupational disease whose symptoms began to develop on or about 15 August 1992. Plaintiff's disability from such occupational disease began on 2 August 1994.
6. Plaintiff has received neither temporary total nor temporary partial compensation since 16 May 1996. Plaintiff has a seven percent permanent partial impairment to her left hand and a seven percent permanent partial impairment to her right hand as a result of her occupational disease. Plaintiff has not received any compensation for either rating.
7. Plaintiff's medical records from Dr. Gary R. Kuzma and Triad Therapy Services, Inc. are received into evidence.
 ***********
Based upon all of the competent, credible evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff, age forty-three, began working for defendant-employer as a seamstress sewing cushions in May 1983. She was paid on a production basis.
2. On or about 15 August 1992, plaintiff sustained the occupational disease of bi-lateral carpal tunnel syndrome. As a result, plaintiff underwent surgery on her right hand on 2 August 1994, surgery on her left hand on 9 September 1994, and surgery on her right thumb on 3 April 1995. She was out of work a substantial amount of time between August 1994 and May 1996 due to the occupational disease, and was paid compensation for temporary total and temporary partial disability by defendant-carrier Key Risk Management Services, Inc. ("Key Risk"). Key Risk paid this compensation and all medical compensation through 16 May 1996.
3. On 6 November 1995, Dr. Kuzma, the orthopedic surgeon who was treating plaintiff, released her to return to her regular work with defendant-employer on a graduated basis with forced mini-breaks and exercises to see how much work she could tolerate. Plaintiff returned to production work. On 18 December 1995, she had a temporary exacerbation of the pain in both hands while working with leather, a heavy and difficult material to sew. Dr. Kuzma gave her a Medrol DosePak and took her out of work. The increase in pain gradually diminished. On 28 December 1995, Dr. Kuzma again released her to return to work on a graduated basis.
4. Plaintiff returned to work for defendant-employer after 1 January 1996 on a graduated basis, and, although her hands remained painful and sore, by March 1996, she had returned to production at her pre-injury wages.
5. On 17 April 1996, plaintiff reached maximum medical improvement with regard to her bilateral carpal tunnel syndrome. Dr. Kuzma released her to return on an "as needed" basis. He rated her at that time with a seven percent permanent partial impairment to her left hand and a seven percent permanent partial impairment to her right hand.
6. On 16 May 1996, plaintiff returned to Dr. Kuzma in tears complaining of increased pain after sewing leather. Dr. Kuzma noted that she may have exceeded her capacity in her job, and ordered a functional capacity evaluation with an analysis of her job. He again gave her a Medrol DosePak and took her out of work for ten days.
7. When plaintiff returned to Dr. Kuzma on 28 May 1996, the symptoms had abated. On 11 June 1996, Dr. Kuzma noted that plaintiff had been producing 175 to 200 percent at work, and advised her about pacing herself. He allowed her to return to work on 11 June 1996.
8. As a result of plaintiff's carpal tunnel syndrome, she was unable to earn any wages with defendant-employer or in any employment from 16 May 1996 until 11 June 1996.
9. As of 11 June 1996, plaintiff worked her regular production job at 100 percent with no restrictions, but making less than her average weekly wage.
10. On 25 July 1996, plaintiff returned to Dr. Kuzma complaining of continued pain and swelling. Dr. Kuzma placed plaintiff on light duty, nonproduction work, which he indicated would be a permanent restriction. However, defendant-employer only provided her with light duty one day. On 30 July 1996, plaintiff was laid off because defendant-employer had no light duty available.
11. As a result of her carpal tunnel syndrome, plaintiff was unable to earn her full pre-injury wages and worked at less than her pre-injury average weekly wage from 11 June 1996 until 30 July 1996.
12. Plaintiff collected unemployment benefits and made a reasonable job search.
13. Dr. Kuzma last saw plaintiff on 15 August 1996. At that time, she was no longer working production with defendant-employer. Her hands were doing reasonably well. At that time, she still had the same percentage of disability with which he had rated her in April 1995.
14. On 3 September 1996, she began working part-time doing office work for another employer making less than her pre-injury wages, while continuing to seek other employment. At the time of the hearing, plaintiff had been unable to find a job making her pre-injury wages.
15. As a result of her carpal tunnel syndrome, plaintiff was unable to earn any wages with plaintiff or in any employment from 30 July 1996 until 3 September 1996. As a result of her carpal tunnel syndrome, plaintiff was unable to earn her full pre-injury wages, and worked at less than her pre-injury average weekly wage, from 3 September 1996 until the date of the hearing.
16. Dr. Kuzma testified, and the Full Commission finds, that plaintiff's increased pain in May 1996 was a flare-up of her symptoms that was probably an indication that her body is not capable of performing production work. The flare-up caused Dr. Kuzma to re-evaluate plaintiff's ability to perform production work and to recommend that she no longer work production. Thus, the Full Commission finds that plaintiff is no longer able to perform production work. However, plaintiff's inability to continue doing production work is related to her original carpal tunnel syndrome. Even though working with leather in May 1996 increased her symptoms for a brief period, it did not worsen her carpal tunnel syndrome and her permanent partial disability did not increase as a result.
17. Plaintiff's exposure to the production work with defendant-employer on 16 May 1996 did not proximately augment plaintiff's carpal tunnel syndrome to any extent.
18. Defendant-carrier Key Risk failed to prove by the greater weight of the evidence that any exposure to the hazards of plaintiff's carpal tunnel syndrome after 31 December 1995 proximately augmented plaintiff's disease to any extent.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On or about 15 August 1992, plaintiff developed a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Defendant-carrier Key Risk Management Services, Inc., was the carrier on the risk when plaintiff was last injuriously exposed to the hazards of the disease. Any exposure to the hazards of the disease after defendant-carrier Riscorp assumed coverage on 1 January 1996 did not proximately augment the disease to any extent. N.C. Gen. Stat. § 97-57. Therefore, defendant-carrier Key Risk Management Services, Inc., is liable for all disability and medical compensation resulting from the occupational disease. N.C. Gen. Stat. § 97-57.
3. As a result of the compensable occupational disease, plaintiff was totally disabled from 16 May 1996 until 11 June 1996, and from 30 July 1996 until 2 September 1996. N.C. Gen. Stat. § 97-29.
4. As a result of the compensable occupational disease, plaintiff was partially disabled from 11 June 1996 until 30 July 1996, and from 3 September 1996 continuing through the time of the hearing. N.C. Gen. Stat. § 97-30.
5. As a result of the compensable occupational disease, plaintiff sustained a seven percent permanent partial impairment to her left hand and a seven percent permanent partial impairment to her right hand. N.C. Gen. Stat. § 97-31.
6. For purposes of determining plaintiff's entitlement to any partial disability benefits pursuant to G.S. 97-30, plaintiff's date of injury is 2 August 1994, the date her disability resulting from the occupational disease began. N.C. Gen. Stat. § 97-30.
7. Plaintiff is entitled to an election of remedies between (A) compensation for the total and partial disability compensation she sustained pursuant to G.S. 97-29 and -30 as set forth above, continuing until such time as plaintiff's earnings meet or exceed her pre-injury wages, not to exceed 300 weeks from 2 August 1994, or (B) compensation for the permanent partial disability she sustained pursuant to G.S. 97-31, as set forth above. Gupton v.Builders Transport, 320 N.C. 38 (1987); Brown v. Public WorksComm'n, 122 N.C. App. 473 (1996).
8. Plaintiff did not specify an election of remedies. Plaintiff would be entitled to $9,502.13 if she elected compensation pursuant to G.S. 97-31. If she elected compensation pursuant to G.S. 97-29 and 97-30, she would be entitled to compensation in the amount of $5,106.46 as of the date of the hearing, and continuing at the rate set forth in the statutes until such time as plaintiff's earnings meet or exceed her pre-injury wages, not to exceed 300 weeks from 2 August 1994. A determination cannot be made based upon the evidence of record as to which would be the most munificent remedy.
9. There was no evidence that any payments pursuant to the Form 21 and Form 26 agreements were more than fourteen days late; plaintiff returned to work at regular wages subsequent to the approval of the Form 21 and Form 26 agreements. Therefore, plaintiff is not entitled to a ten percent penalty on any unpaid amounts. N.C. Gen. Stat. § 97-18.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Upon plaintiff's return to work at or above her pre-injury average weekly wage, or 300 weeks from 2 August 1994, whichever comes first, plaintiff shall elect between compensation pursuant to G.S. 97-29 and -30 or compensation pursuant to G.S.97-31.
2. Meanwhile, defendant-carrier Key Risk Management Services, Inc., shall pay plaintiff compensation pursuant to G.S.97-29 and -30, including such amounts accrued to date, subject to the attorney's fee awarded below. Such payments shall continue at the rate set forth in the statutes until plaintiff returns to work at or above pre-injury wages or until 300 weeks from 2 August 1994, whichever comes first, also subject to the attorney's fee awarded below.
3. If plaintiff then determines that compensation pursuant to G.S. 97-31 is more munificent and elects compensation pursuant to that statute, the defendants shall then be entitled to a credit for all disability compensation paid after plaintiff reached maximum medical improvement on 17 April 1996, and defendant-carrier Key Risk Management Services, Inc., shall pay the balance.
4. An attorney's fee of twenty-five percent of all accrued amounts shall be deducted from all accrued amounts by defendant-carrier Key Risk Management Services, Inc., and paid directly to plaintiff's attorney. Plaintiff's counsel shall also be entitled to twenty-five percent of all amounts payable in the future, whether pursuant to G.S. 97-29 and -30 or G.S. 97-31, which defendant-carrier Key Risk Management Services shall also pay directly to plaintiff's counsel.
5. Defendant-carrier Key Risk Management Services shall pay the costs.
 *********** S/ ________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ _______________ THOMAS J. BOLCH COMMISSIONER
S/ _______________ CHRISTOPHER SCOTT COMMISSIONER